Maurice COLEMAN *v.* STATE of Arkansas

CR 93-676 869 S.W.2d 713

Supreme Court of Arkansas
Opinion delivered January 31, 1994

*Bill E. Ross*, by: *Mikke Connealy Bracey*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. This is an appeal from a criminal conviction on the charge of first-degree murder in the slaying of nineteen-year-old Stephen Jerome Woodard. The appellant, Maurice Coleman, was sentenced to life imprisonment. On appeal, he raises three arguments for reversal: (1) his custodial statement should have been suppressed, (2) the trial court erred in failing to grant Coleman's directed verdict motion, and (3) evidence of his prior convictions should not have been admissible. We affirm.

### I. Failure to grant motion for directed verdict —

### Sufficiency of the evidence

We address Coleman's directed verdict contention first because it involves a challenge to the sufficiency of the evidence which must be considered prior to a review of trial errors. *See Owens* v. *State*, 313 Ark. 520, 856 S.W.2d 288 (1993). The directed verdict motions were properly made and preserved.

A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Friar* v. *State*, 313 Ark. 253, 854 S.W.2d 318 (1993). The test for determining the sufficiency of the evidence is whether there is substantial evidence to support the verdict. *Ricketts* v. *State*, 292 Ark. 256, 729 S.W.2d 400 (1987). On appeal we review the evidence in the light most favorable to the appellee and sustain the conviction if there is any substantial evidence to support it. *Abdullah* v. *State*, 301 Ark. 235, 783 S.W.2d 58 (1990). Evidence is substantial if it is of suf-

ficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Friar, supra; Hodge* v. *State,* 303 Ark. 375, 797 S.W.2d 432 (1990). A defendant's intent to commit murder may be inferred from the type of weapon used, and the nature, extent, and location of the wounds. *Allen* v. *State*, 310 Ark. 384, 838 S.W.2d 346 (1992).

■ Arkansas Code Annotated § 5-10-102(a)(2) (Repl. 1993) provides that a person commits murder in the first degree if, "With a purpose of causing the death of another person, he causes the death of another person." Coleman claims that the evidence was insufficient, stressing that "there was no plausible connection between the death of Steven Jerome Woodard and Maurice Coleman." This contention is not true.

The strongest evidence supporting Coleman's conviction is his custodial statement to the police in which he admitted the following: He, Shawn "Too Short" Jefferson, and the victim travelled to Williams Park in Blytheville, Arkansas, after having consumed crack cocaine. The three men were in a white car driven by Woodard — he was in the backseat and Jefferson in the front —and Woodard and Jefferson were quarreling over a statement Woodard had made to the police regarding a murder that had occurred in Cherokee Court a few days earlier, when he produced a chrome semi-automatic .25 handgun, fired at Woodard from the backseat, striking him in the back of the head. Jefferson dragged Woodard out of the car, intending to put him in the trunk, when Woodard ran a short distance yelling, "I'm dead." Woodard fell, and he and "Too Short" obtained a tire tool and took turns repeatedly beating him on the head. Nevertheless, Woodard refused to die, and they "drove over him and back" with the car "trying to make sure he was dead." Believing Woodard was still alive, they placed him in the trunk, drove to "Senior Citizens Pond" and partially submerged the car in the water.

In his statement, Coleman also referred to one of Woodard's shoes that Jefferson had thrown away from Woodard's body. A shoe was discovered by Detective Hill at Williams Park. He identified to the officers and to the jury a shirt worn by him on the night of the murder that was submitted to the crime lab for tests. Although stains on the shirt were identified as human blood, there was not enough present to positively identify it as the victim's blood.

Other witnesses testimony corroborates parts of Coleman's statement to the police. Lucretia Jones, Woodard's girlfriend, testified that Woodard had access to her car, a 1981 white Ford, and that she discovered it missing the morning of July 21, 1992. She later identified the car the police officers pulled from a pond which contained Woodard's body in its trunk as her car.

Kim Smith, Woodard's sister, testified that she saw her brother, Coleman, Jefferson, Margaret James, and others, at her apartment the night before Woodard disappeared. According to her testimony, at one point she looked outside and saw her brother and Jefferson "fixing to charge each other." Later, she saw Woodard leave in the white Ford automobile and saw Coleman and Jefferson leave on foot in the same direction as Woodard was driving. Minutes later, she saw the car come "flying out of the project." She tentatively identified the driver as her brother, the backseat passenger as Coleman and Jefferson as sitting in front.

Margaret James testified that Coleman and Jefferson arrived at Ms. Smith's apartment together and Woodard arrived by himself, having driven in his girlfriend's car. When Woodard left and got in the car, she saw Coleman and Jefferson leave on foot. About five minutes later, she saw the car drive by. She assumed the three male occupants were Woodard, Coleman, and Jefferson.

Floyd Moran testified that he often picked up cans at local parks, and on July 21, 1992, he went to Williams Park in Blytheville. He reported to the police that there was an area of pavement near a shelter that appeared to be marked by a large amount of fresh blood and shirt buttons. During Detective Hill's investigation of the park, he discovered body tissue, an earring, shirt buttons, and a shoe. The shoe was later matched to its mate on Woodard's body.

The gun, a chrome .25 semi-automatic pistol, was discovered, due to a lead from Jefferson, buried in a bean field located about two miles from Williams Park. A bullet recovered from the dash on the driver's side of the Ford matched the recovered firearm. Ron Andrejack, a firearms examiner with the State Crime Lab, testified that the bullet fragments recovered from Woodard's body were .25 caliber but were so mutilated that identification with a specific .25 caliber firearm was impossible.

■ Dr. William Sturner, Chief Medical Examiner with the State Crime Lab, testified regarding the results of his autopsy of Woodard. He discovered gunshot wounds on three locations on the victim: three on the right side of his head, three to his back and a "though and through" superficial wound on the right shoulder. Sturner also described abrasions on various parts of the deceased — on his head, chest, shoulders, elbow, knuckles — consistent with having been dragged or scraped across pavement. These witnesses' testimony is corroborative and consistent with Coleman's statement to the police. This evidence, together with Coleman's statement, is more than sufficient to support the verdict of first-degree murder.

■ Coleman argues that there was not sufficient corroboration of the accomplice testimony of Jefferson. Due to the facts that Jefferson neither testified nor was he charged as an accomplice, and the jury was not instructed as to accomplice liability, this argument is without basis.

## II. Voluntariness of custodial statement

Coleman next contends that the police coerced him into making his taped confession and, therefore, the trial court erred in refusing to suppress his custodial statement.

■■ Custodial statements are presumed involuntary, and the State has the burden of proving otherwise. *Johnson* v. *State*, 307 Ark. 525, 823 S.W.2d 440 (1992). In considering a motion to suppress a custodial statement, we make an independent determination of the voluntariness of the confession but do not set aside the trial judge's finding unless it is clearly against the preponderance of the evidence. *Henderson* v. *State*, 311 Ark. 398, 844 S.W.2d 360 (1993).

■■ Typically, the question of whether the trial court erred in admitting a confession into evidence is two pronged: (1) whether the trial court erred in holding that the proof showed that the waiver and confession were voluntarily given; and (2) whether the trial court erred in holding that the proof showed that the waiver and confession were knowingly and intelligently given. *See Weger* v. *State*, No. CR93-408 (January 24, 1994). In his brief, Coleman addresses both the issue of voluntariness and whether or not the proof showed his waiver and confession

were knowingly and intelligently given. However, in Coleman's motion to suppress, as abstracted, he questions only the voluntariness of his confession and notes that the court's ruling on *suppression of involuntary statement* was denied. For this reason, we limit our discussion to this single issue.

The testimony is in conflict on the issue of voluntariness. At the hearing on the motion to suppress, Blytheville Police Detectives Hill and Gann submitted that they did not coerce or threaten Coleman in any way. Coleman was arrested for the murder of Woodard, was read his rights, and signed a rights-waiver form. He was questioned that day by Detective Hill, but this interview was not recorded. Coleman was then sent to Jonesboro for a polygraph test but was returned to the Blytheville jail that same evening. At about 8:30 a.m. the following day, Detective Gann advised Coleman of his rights and had him sign a second rights waiver form. From about 8:30 a.m. until his talk with Coleman at 10:30 a.m. Gann was fingerprinting and photographing prisoners, including Coleman. At 10:30 a.m. Gann resumed his contact with Coleman and at 11:30 a.m., Gann, along with Hill, recorded the statement at issue.

Coleman contends that on the morning of the recording he repeatedly told Hill that he "didn't have no knowledge of this situation," to which Hill allegedly responded, "When you sit here and you pretend you can't remember nothin' you say your mind is so gone where you can't remember being here, this taking place. We got a different version from Shawn Jefferson. As long as you sit here and play this little game. . .I give you my word. . . that you're going to get death row." Hill added, "You know Jerome as well as I do. He ain't worth dying over because you know as well as I do he was a known drug dealer." Coleman contends that he finally agreed to make a statement after Hill told him again that if he did not make some statement regarding what he had done, he would "see to it that you get death row or lethal injection." Coleman also claims it scared him when Hill advised, "If I wanted to help myself — life or maybe forty or fifty years but at least you got some chance. The way you're playing it I'm going to see to it that you will never get to see the streets no more if you get lethal injection or the electric chair." When Coleman asked Hill if he could have a lawyer present when he made his statement, Hill respond-

ed, "You know yourself there ain't no way you can have a lawyer present now. We read you your rights and everything but you know yourself you can't get no lawyer until after you get your bond set and get in Circuit Court."

Coleman now claims, as he did in his testimony at the *Denno* hearing and before the jury, that the police basically scripted his tape-recorded statement for him and that he gave the statement due to threats of "death row" or "lethal injection." However, the facts as to these claims are disputed. Both Hill and Gann testified that they did not threaten, promise or coerce Coleman in any way, although Hill did admit that he confronted Coleman with elements of Jefferson's statement to the police that implicated him in the murder of Woodard. Further, Coleman's allegation that he asked for a lawyer is denied by the officers and is not reflected in his tape-recorded statement.

 The conflicting testimony during the *Denno* hearing presented issues of credibility to be resolved by the trial court. See *Fleming* v. *State*, 284 Ark. 307, 681 S.W.2d 390 (1984). Clearly, the recorded statements given by Coleman, together with the record of the proceedings on the motion to suppress, supported the trial court's refusal to grant the motion to suppress his recorded statement. *See Morris* v. *State*, 302 Ark. 532, 792 S.W.2d 288 (1990). Coleman renewed his objections to the voluntariness of the confession at trial when his taped confession was admitted to the jury. When he testified in his own defense, he again denied his participation in the murder, claiming that the officers had scared him into making his confession. His credibility then became a question for the jury to decide. *See Moore* v. *State*, 315 Ark. 131, 864 S.W.2d 863 (1993); *Jones* v. *State*, 314 Ark. 289, 862 S.W.2d 242 (1993).

### III. Evidence of prior convictions admitted to impeach

For his last argument for reversal, Coleman claims that the trial court abused its discretion in permitting the State to impeach him with evidence of his prior convictions. Coleman filed a motion in limine asking that the evidence of his two prior convictions occurring in the last ten years be inadmissible in the event that he took the stand. Coleman contended that the prej-

udicial value of such evidence in a murder trial outweighed the probative value. The trial court found that Coleman's prior convictions for burglary and theft of property could be used to impeach him, explaining that, "The question of his — should he testify, his truthfulness would be an issue and the long standing tradition is to allow impeachment as to truthfulness on burglary and theft."

Rule 609(a) of the Arkansas Rules of Evidence provides the general rule for attacking the credibility of a witness with evidence of prior convictions:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted but only if the crime (1) was punishable by death or imprisonment in excess of one (1) year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party or a witness, or (2) involved dishonesty or false statement, regardless of the punishment.

The trial court has considerable discretion in determining whether the probative value of a prior conviction outweighs its prejudicial effect and will not be reversed absent an abuse of discretion. *Pollard* v. *State*, 296 Ark. 299, 756 S.W.2d 455 (1988). This rule concerns itself with the credibility of a witness who is offering testimony in the current case and admissibility must be decided on a case-by-case basis. *Id.* When a defendant in a criminal case takes the stand in his own behalf, credibility becomes an issue and the State may, under certain circumstances, test that credibility by asking the defendant if he has been convicted of certain crimes. *Gustafson* v. *State*, 267 Ark. 278, 590 S.W.2d 853 (1979).

Since Coleman disputed the accuracy of his recorded statement to Detective Gann, his credibility was at issue. When testifying before the jury, Coleman claimed that the detectives had coerced him into making the recorded statement and that "They did everything but write a script for me to follow while giving this statement so I'd be sure and accurate when I said it." Under the circumstances, admission of his two prior convictions for burglary and theft was not error.

The record has been examined in accordance with Ark. Sup. Ct. R. 4-3(h), and it has been determined that there were no rulings adverse to the appellant which constituted prejudicial error.

Affirmed.