Ray DANSBY *v.* STATE of Arkansas

CR 94-30                                        893 S.W.2d 331

Supreme Court of Arkansas
Opinion delivered February 20, 1995
[Rehearing denied March 27, 1995.*]

*Roaf, J., not participating.

510

*Jan Thornton*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. The appellant, Ray Dansby, was charged and convicted of the capital murders of his ex-wife, Brenda Dansby, and Ronnie Kimble, and was sentenced by jury on each charge to death by lethal injection. It is from the verdict and sentence that this appeal is brought. As required by Rule 4-3(h), all abstracted rulings adverse to Dansby as well as the points raised on his appeal have been reviewed. We find no error from the trial court and affirm.

The facts as related by the various witnesses are these. On the morning of August 24, 1992, Brenda Dansby left her residence at 1402 North Roselawn in El Dorado to go to the store to get her eight-year-old son, Justin, some orange juice, as he was sick with a cold. Brenda's boyfriend, Ronnie Kimble, was sleeping on a couch in the living room, while Justin was seated in a red chair in the same room watching television. According to Justin, his father, Appellant Ray Dansby, came around the side of the house to the front yard as his mother was pulling up into their drive-way in her car. Ray ordered her to get out of the car twice before she complied. Justin looked out the screen door and watched as his father "had my mother like a shield" then "shot [her] in the arm and then in the neck." Ray then came in the house, and, according to Justin, it was after Ray shot Ronnie in the chest that Ronnie got his gun, which was located underneath the couch, and positioned himself behind it. Justin had returned to his seat on the red chair, and "was afraid I was going to get shot so I lifted my feet up." Justin further testified that he heard "clicking noises" and that Ronnie shot his gun, but that, to his knowledge, the weapon never did fire. Ray then chased Ronnie through a straight hallway to Justin's room in the back of the house, and thereafter, Justin heard about five more shots. It was Justin's tes-

timony that he retreated to his mother's room to see what had happened, and saw his father standing by Ronnie, observed him kick Ronnie twice, and heard Ray say something to him, though he could not remember what it was. As Justin exited the house, he saw his mother, who "had blood all over her neck" and "wasn't moving." He then left with his father, and the two walked down the road, and when they separated, Justin called the police from another residence.

Greg Riggins, Brenda's neighbor who lived across the street, testified that he was in bed when he heard shots, at which time he jumped up and went to his front door, where he witnessed Brenda and Ray struggling with a revolver. He watched as Ray, who was standing directly behind Brenda, hit her in the back with his fist, knocking her down into the corner of the house. According to Mr. Riggins, Ray got the gun away from Brenda, stood two or three feet away from her, and shot two rounds consecutively, knocking her flat on the ground. As Brenda tried to sit up, Ray discharged another shot, which Mr. Riggins believed missed Brenda. It was Mr. Riggins testimony that "then after maybe five or six seconds he paused and the next shot went off. I assume he hit her in the head and her head launched and she went flat." Mr. Riggins stated that Justin was standing by the second post at the front of the house and witnessed his mother's murder. He further testified that, while he did not see any shots coming from the house, Ray ducked and hesitated before firing a shot, then went into the house after someone inside.

Several El Dorado police officers were dispatched to the residence at approximately 8:28 a.m., one of whom was Officer Larry Weaver. He arrived at the scene to find Brenda's body outside, and Ronnie injured on the floor in the back bedroom, who was attempting to crawl and had a .38 automatic pistol laying under him which was jammed and opened where it would not work. Ronnie died several days later at an area hospital, after telling Detective Carolyn Dykes that Ray had shot him.

Shortly thereafter, Officer Mike Stegall located Ray walking on a nearby street, at which point Ray flagged him down, stating that "I'm Ray Dansby, ya'll are looking for me." When Officer Stegall inquired as to whether he had any guns on him, Ray replied that he had thrown them away. After being trans-

ported to the police station, Ray was verbally advised of his rights by Lieutenant Mike Hill, then stated that he left the scene with a .32 revolver and a .38 revolver, which he threw away where officers would never find them. Ray further stated to the officers that he took the weapons to Brenda's residence because he knew that she had a .38 and that Ronnie had a handgun of some type. According to Ray, upon his arrival at the residence, he walked in the front door, where he was met by Ronnie, who was holding a handgun in his right hand "pointed down." After an argument or discussion erupted, Ray said, "I just pulled my gun and started shooting." After making these statements and submitting to a gunshot residue test, Ray signed a written rights waiver form, but refused to give a taped statement.

Lt. Hill stated that he was present when a .38 Interarms blue steel revolver was recovered under a manhole cover in the bottom of a drainage ditch on a street approximately three to four blocks from Brenda's residence. At the time of recovery, the weapon, which was registered to Brenda, had five expended cartridge cases in the cylinder.

Sergeant Ricky Roberts testified that, along with a set of car keys, a purse, and a gun carrying case, four .32 caliber live rounds of ammunition were found under Brenda's body. Additionally, seven rounds of .38 caliber ammunition were laying around her body, and another .38 round was found on the porch. Inside, Sgt. Roberts stated that there was blood behind and on the back of the couch in the living room, as well as on a dress on an ironing board and on some houseshoes which were both located behind the couch. A silver-tipped round .38 bullet was also recovered from behind the couch, similar to two rounds found in the clip and the one jammed inside the .38 Colt automatic which was recovered near Ronnie, but different from the other .38 rounds recovered.

Ann Hoff, a criminalist with the State Crime Lab, analyzed the gun shot residue kit taken from Ray, and found residue on both his hands. She received a kit submitted on Brenda by the medical examiner's office, and also received positive results, explaining that residue found on her hands would be consistent with a struggle over the gun if it had gone off, with her hands being held up while being shot, or with her firing the gun.

Dr. Frank Peretti, Associate Medical Examiner with the State

Crime Lab, performed autopsies on both victims and testified that on Brenda's body, he located gunshot wounds near the left ear and upper chest. On Ronnie's body, he observed gunshot wounds behind the left ear, chest, left upper back, right arm, and two superficial wounds on the left flank. It was Dr. Peretti's opinion that Ronnie was "probably bent over" when he was shot in the back, and that the cause of death was pneumonia complicating multiple gun shot wounds.

Berwin Monroe, a firearms expert with the State Crime Lab, testified that three of the four bullets recovered from Ronnie's body were of the .32 caliber class, and that the fourth bullet was fired from Brenda's gun, the .38 Interarms blue steel revolver. It was Mr. Monroe's testimony that the bullet recovered from Brenda's chest and the fragments recovered from her head were also fired from her gun.

Lisa Bridges, a receptionist at the prosecutor's office, testified that she notarized an affidavit signed by Brenda on August 3, 1992, which she passed on to the deputy prosecutor, who in turn filed charges against Ray. Paula Henderson, the chief deputy clerk for the municipal court, confirmed that Ray was scheduled to appear at 9:00 a.m. on the day of the murders on charges of assault in the second degree and contempt of court. Officer James Morrow testified that on July 21, 1992, he was dispatched to Brenda's residence after she had complained that an unwanted person, Ray Dansby, was there. At destination, he observed Brenda and Ray talking out in the yard, and recalled that as Brenda had a gun between the seats of her car, he advised her that she needed to keep it in her house. Officer Morrow further testified that he advised Ray that he needed to leave the property, that he was not to return, and that Ray left without further incident.

At trial, Larry McDuffie, a witness for the State, testified that Ray, who was his girlfriend's half-brother, confessed to committing the murders while they were in jail together on August 24, 1992. According to McDuffie, Ray stated that he went to Brenda's residence after she refused to "take those papers off of him," referring to his pending municipal charges, as "he wasn't going to go to jail for nothing this time."

Dansby raises ten points on appeal which will be discussed

in the same sequence as presented to this court, except as to a portion of Point III which relates to the sufficiency of the evidence.

### Sufficiency of the evidence

Dansby combines his challenge to the sufficiency of the evidence with his third argument that the capital murder and first-degree murder statutes unconstitutionally overlap. We consider a challenge to the sufficiency of the evidence prior to a review of trial errors. *See Coleman* v. *State*, 315 Ark. 610, 869 S.W.2d 713 (1994). The test for determining the sufficiency of the evidence is whether there is substantial evidence to support the verdict. *Ricketts* v. *State*, 292 Ark. 256, 729 S.W.2d 400 (1987). On appeal, we will review the evidence in the light most favorable to the appellee and sustain the conviction if there is any substantial evidence to support it. *Abdullah* v. *State*, 301 Ark. 235, 783 S.W.2d 58 (1990). Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Friar* v. *State*, 313 Ark. 253, 854 S.W.2d 318 (1993). A defendant's intent to commit murder may be inferred from the type of weapon used, and the nature, extent, and location of the wounds. *Allen* v. *State*, 310 Ark. 384, 838 S.W.2d 346 (1992).

Dansby asserts that there is insufficient evidence of premeditation and deliberation to prove the capital murder charge; however, the evidence presented and testimony at trial defeats this assertion. Although the testimony is at variance among different witnesses as to the exact sequence of events during the shootings, there was much said as to the weapons used, and as to the nature, extent, and location of Ms. Dansby's and Mr. Kimble's wounds. With reference to the shots fired into Brenda, Dr. Peretti testified that he located gunshot wounds near the left ear and upper chest of her body. Greg Riggins, an eye witness to Brenda's murder, testified as to Ray's hesitation of several seconds before he fired the final shot into Brenda's head. In observance of the wounds to Ronnie's body, Dr. Peretti testified that Ronnie sustained wounds to the left ear, chest, left upper back, and right arm, as well as two superficial wounds to the left flank. Particularly, it was Dr. Peretti's opinion that the wound to Ronnie's back occurred when he was "probably bent over." Ray's

son Justin, another eye witness, testified that he watched as his father kicked Ronnie twice, and that he heard his father say something after shooting him. In light of this testimony, the jury could have easily inferred that Dansby fired multiple shots into both victims in a premeditated and deliberated manner. Also significant was Larry McDuffie's testimony that Ray admitted to having committed the murders, as Ray was troubled by misdemeanor charges which Brenda had caused to be filed against him, which was corroborated by testimony that Ray was due in court on the morning of the incident. In sum, the evidence was overwhelming that Dansby's killings of Brenda Dansby and Ronnie Kimble were premeditated and deliberate acts.

## I. Defective jury panel

Prior to trial, Dansby filed a motion to "assure cross section of community for jury," in which he proposed, in addition to telephone summonses, that potential jurors be summoned by mail in order to assure that the jury would represent a cross-section of the community. Although Dansby asserts in his brief that the trial court denied his motion, he neither abstracts a ruling of the court, nor is one found in the record. It is Dansby's burden to obtain a ruling on his motion, and matters left unresolved may not be raised on appeal. *See Gilland* v. *State*, 318 Ark. 72, 883 S.W.2d 474 (1994). In his brief, Dansby claims that the jury was not proper in its racial makeup and that this was error *per se*. Yet the record is barren of any information as to the composition of the jury or that Dansby made any specific objection in this regard. At most, the transcript of trial reveals that, prior to seating the jury, the trial court made inquiry of Dansby as to whether the jury was acceptable to him, to which Dansby replied that he "would just continue [his] *Batson* objection towards the whole panel." In short, Dansby's challenge to the jury panel on the grounds that it did not represent a cross-section of the community was neither raised nor sufficiently developed at trial for our consideration on appeal. *See Hollamon* v. *State*, 312 Ark. 48, 846 S.W.2d 663 (1993).

## II. Jury's ability to show mercy

Dansby argues that Form Three of the Arkansas Model Instructions: Criminal (2d ed.) on conclusions results in a manda-

tory death sentence precluding the jury's option to show mercy. We have recently rejected the argument that Arkansas's statutory scheme results in a mandatory death sentence in *Sheridan* v. *State*, 313 Ark. 23, 34, 852 S.W.2d 772, 778 (1993), in which we quoted from our earlier decision in *Johnson* v. *State*, 308 Ark. 7, 17-18, 823 S.W.2d 800, 806 (1992), *cert. denied*, 112 S.Ct. 3043 (1992):

> The appellant next argues that "the Arkansas capital murder statutory scheme becomes a mandatory death statute, and as such, is unconstitutional because it does not allow the jury to show mercy to a particular defendant." We most recently rejected this argument in *Hill* v. *State*, 289 Ark. 387, 713 S.W.2d 233 (1986). There, quoting from *Clines, Holmes, Ritchey & Orndorff* v. *State*, 280 Ark. 77, 82, 656 S.W.2d 684, 686 (1983), we wrote: "[W]hatever the jury may find with respect to aggravation versus mitigation, it is free to return a verdict of life without parole, simply by finding that the aggravating circumstances do not justify a sentence of death."

Simply put, Section (C) of Form Three provides as follows:

> (C). ( ) The aggravating circumstances justify beyond a reasonable doubt a sentence of death.
>
> > (If you do not unanimously agree to check paragraph (c) then sentence Ray Dansby to life imprisonment without parole on Form 4.)

Obviously, the language in Form Three itself does permit the jury to show mercy. We thus reject Dansby's argument on this point.

### III. Overlap of offenses

Dansby next argues that the capital murder statute is unconstitutional under the Eighth and Fourteenth Amendments because there is no difference between "premeditation and deliberation" and "purposely," and thus, the capital murder and the first-degree murder statutes impermissibly overlap. We rejected this argument in *Sheridan* v. *State, supra:*

> Appellant's second constitutional challenge is that the elements of "premeditated and deliberated" capital murder,

§ 5-10-101(a)(4), and the elements of "purposeful" first-degree murder, Ark. Code Ann. § 5-10-102(a)(2) (Supp. 1991), impermissibly overlap. We have previously rejected this argument based on the same rationale we have used to uphold capital felony murder and first degree felony murder. *Smith* v. *State*, 306 Ark. 483, 815 S.W.2d 922 (1991). As long as there is no impermissible uncertainty in the definitions of these offenses, the mere existence of any overlapping does not render a statute constitutionally infirm. *Sellers* v. *State*, 300 Ark. 280, 778 S.W.2d 603 (1989); *White* v. *State*, 298 Ark. 55, 764 S.W.2d 613 (1989); *Cromwell* v. *State*, 269 Ark. 104, 598 S.W.2d 733 (1980).

*Sheridan* v. *State, supra*, at 33-4, 777 (quoting *Ward* v. *State*, 308 Ark. 415, 418-9, 827 S.W.2d 110, 111-2 (1992)).

### IV. Motion for continuance

As we have stated many times, the denial of a motion for a continuance is within the sound discretion of the trial court, and the trial court's ruling will be reversed only if there is an abuse of discretion. *Mann* v. *State*, 291 Ark. 4, 722 S.W.2d 266 (1986). The appellant must show prejudice from the denial of the continuance, and we will not overturn the trial court's ruling unless the appellant has demonstrated an abuse of discretion. *Davis* v. *State*, 318 Ark. 212, 885 S.W.2d 212 (1994).

On appeal, Dansby argues that trial court erred in refusing to grant his motion for continuance on the grounds that evidence provided by the State relating to its witness, Larry McDuffie, was not provided to him within sufficient time to allow his review of the information. This issue was raised at a hearing prior to trial on April 6, 1993, at which time the trial court, upon Dansby's request, continued the case until June 9, 1993. Additionally, after hearing arguments from both sides concerning what the State was required to provide to Dansby under A.R.Cr.P. 17, the trial court ordered that the State provide information as to dispositions on McDuffie's criminal convictions pursuant to Rule 17(a)(6).

At trial, Dansby again requested a continuance due to the absence of a witness, Calvin Pascal, a Louisiana resident, asserting that Pascal would testify that it was Dansby's habit to

a carry a gun. As the State correctly asserts, Ark. Code Ann. § 16-63-402 (1987) requires that when a witness is absent, an affidavit must be filed showing the facts the affiant believes the witness will prove and that the affiant believes these facts to be true. This was not done. *See also David* v. *State*, 295 Ark. 131, 748 S.W.2d 117 (1988). Under these circumstances, the trial court did not abuse its discretion in refusing to grant a continuance.

### V. Credibility of state's witness — McDuffie

Larry McDuffie testified that Ray Dansby confessed to him about the murders while both were in jail, as follows. He took a .32 caliber revolver with five extra bullets to Brenda's residence on the day in question, and upon his arrival, Brenda told him that she "wasn't going to take the papers off so he might as well leave," and Ronnie told him to leave too. He then shot Ronnie twice in the chest with the .32, grabbed Brenda around the neck, shot her, and took her gun. Ronnie then found out his gun wouldn't shoot, so he ran behind the couch, and Ray shot twice in that direction. When Ronnie ran, he "shot him once in the back or the ass somewhere," and Ronnie fell in "the kid's room." He then walked up to Ronnie and kicked him once, shot him, kicked him two more times, then shot him again, stating, "you die mother f-----." After going outside to Brenda, she pleaded, "well Ray please don't kill me," to which he replied, "well b---- you done f----- up cause I'm not gonna leave you out here in these streets when I done killed this man inside." He then put the pistol to her head and "blowed her brains out."

According to McDuffie, Ray stated that he was "just glad" Brenda was dead, and that "she was playing both ends against the middle and he just got tired of it." Ray further commented that Ronnie's gun never did fire, that Brenda's gun was in her purse, and that he should have picked up and fired Ronnie's gun at the door to make it look like self-defense.

Dansby argues that the trial court erred in excluding evidence of all prior criminal activity of McDuffie, thereby precluding Dansby from presenting a complete picture on the issues of bias and credibility, as Dansby was attempting to prove that McDuffie, while in jail, was acting as a police informant, and in this capacity, solicited Ray's confession. There were numerous motions filed prior to trial by each side relating both to the admis-

sibility of McDuffie's testimony, and to what the State was required to disclose to Dansby in terms of McDuffie's prior dealings with police.

After hearing Dansby's request to admit certain jail records and booking cards in an attempt to show that McDuffie had received preferential treatment after being arrested and was thus biased in favor of the State, the court issued a detailed ruling on this issue, finding that any evidence of guarantees of immunity or promises of leniency were proper subjects for cross-examination, which was fully exercised by Dansby, but that in the absence of any direct evidence of such an agreement or promise, no extrinsic evidence would be allowed.

As to the credibility issue, the trial court's ruling was right on the mark. As we stated recently in *Biggers* v. *State, supra*, Arkansas Rule of Evidence 608(b) governs the credibility question, which states as follows:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, *may not be proved by extrinsic evidence*. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination . . . .

(Emphasis added.)

In *Biggers*, a witness for the State admitted on cross-examination that he had previously lied to his supervisors at work which resulted in suspension, and that he had been the subject of an investigation for theft of property. We stated that Rule 608(b) expressly prohibits the introduction of extrinsic evidence to prove such misconduct, even if the witness denied the event. *Biggers* v. *State, supra.*

The trial court was likewise correct in its ruling dealing with reference to the issue of proof to show bias. Granted, we have said that a matter is not collateral if the evidence is relevant to show bias, knowledge, or interest. *See Pyle* v. *State*, 314 Ark. 165, 862 S.W.2d 823 (1993), *cert. denied*, 114 S.Ct. 1306 (1994). Stated another way, if a witness denies or does not fully admit the facts claimed to show bias, the attacker has a right to prove

those facts by extrinsic evidence. *Wood* v. *White*, 311 Ark. 168, 842 S.W.2d 24 (1992).

Here, Dansby was allowed to explore the area of bias in his cross-examination of McDuffie as a witness. He did not deny that he had been a confidential informant for the police, and further admitted that he had signed a contract with law enforcement. Dansby asserts, however, that he proffered "substantial testimony" of McDuffie's bias that the jury should have been allowed to hear. The proffered testimony was as follows. Paula Henderson, the chief deputy clerk with the Union County Municipal Court, testified that she could not tell whether bond was set for Mr. McDuffie's felony charge for which he had been incarcerated at the time of Dansby's alleged confession, nor could she determine whether bond had been set or a plea had been entered on subsequent misdemeanor charges. Calvin Leveritt, a probation officer, testified that there was no indication from the records as to whether McDuffie had a first appearance on subsequent misdemeanor charges, whereas Officer Terry Davis with the El Dorado Police Department testified that he had made the arrests and that McDuffie was to be so held. W.D. Brewster, an administrator of the Union County Jail, testified that a booking card for a subsequent misdemeanor offense reflected the notation, "Hold for Detectives," and allowed for McDuffie's release on his own recognizance.

In making its ruling, the trial court observed that while McDuffie advised the authorities of Dansby's confession to him only a few days after the murders, none of the extraneous evidence which Dansby sought to admit into evidence took place prior to McDuffie's relating Dansby's statement to the authorities. We agree with the trial court's assessment that the proffered testimony falls short of direct evidence of an agreement or promise of immunity, and that the admission of McDuffie's subsequent arrests on misdemeanor charges through booking cards and jail records "would call upon the jury to perform a feat of speculation or conjecture in order to relate it to [the] alleged bias." In sum, Dansby's proffered evidence was not relevant to show bias, and the trial court's well-reasoned ruling was correct.

### VI. Prior bad acts

Dansby further complains that the trial court erred in refusing to grant a mistrial when the State, during cross-exami-

nation of his mother, Marie Dansby, inquired "about trouble that [he] had gotten into." We find no inquiry as such. Instead, we note that during direct examination, counsel for Dansby asked Ms. Dansby if Brenda's and Ray's relationship could be characterized as "on again/off again," to which she replied affirmatively. On cross-examination, the exchange in question took place as follows:

COUNSEL FOR STATE: Would you describe their relationship as on again, off again?

WITNESS: Yes.

COUNSEL FOR STATE: Now what do you mean by that?

WITNESS: I mean it was on again and off again. When he was working, he was up here and when he wasn't, he was home. That's what I mean.

COUNSEL FOR STATE: Oh, so physically you mean, that when he was physically present it was on but if he was physically not present, it was off. Is that what you mean?

WITNESS: No, it was not what I mean. I mean when he would be arrested and sent to prison and all of this stuff about nothing and she would be free to do whatever she wanted to do, that's what I mean.

COUNSEL FOR STATE: That was when it was off?

WITNESS: It had to be off then when he was locked up, that's what you're . . .

COUNSEL FOR DEFENDANT: Objection, Your Honor. We've got to approach.

The State asserts, and we agree, that one who opens a line of questioning or is responsible for the line of inquiry should not be heard to complain on appeal. *Cavin* v. *State*, 313 Ark. 238, 855 S.W.2d 285 (1993). While the State was properly exploring an area of inquiry that was begun on direct examination, Marie Dansby's testimony was in no way responsive to the question asked; rather, she offered the testimony on her own accord. Under these circumstances, a mistrial was not appropriate.

### VII. *Witness's comment about invocation of Fifth Amendment Rights*

Dansby asserts that the trial court erred in failing to grant a mistrial after Lieutenant Mike Hill made an improper reference to Dansby's invocation of his right to remain silent under the Fifth Amendment to the Constitution of the United States. Prior to the testimony in question, Lt. Hill stated that, after he verbally read Dansby his rights, Dansby gave a statement and allowed him to take samples from his hands for a gunshot residue kit. The exchange in question took place as follows:

> COUNSEL FOR STATE: Did he appear to understand his rights as you verbally advised . . .

> WITNESS: Yes.

> COUNSEL FOR STATE: . . . him of them?

> COUNSEL FOR STATE: And did you have a conversation with him about these events at all?

> WITNESS: Yes, after I informed him, of course, that he had the right to remain silent. Anything he said could be used against him in a court of law, and that, you know, if he wanted to have a lawyer present during questioning he could have one. And I asked him if he understood that at any time, you know, that he didn't wish to talk any longer he didn't have to.

> I said or I asked him it's very important that we find this gun. I said anyone could pick this gun up. What did you do with it? At this point he began to tell me that he left the scene with two guns, a .32 and a .38, both revolvers. And that he threw them away where we would never find 'em and he wasn't worried about anyone finding 'em.

> After obtaining the gunshot residue kit, I sat down at my desk and again informed him of his rights. This time I read him his rights from the standard waiver form that we use which he again acknowledged that he understood and signed the form.

> COUNSEL FOR STATE: I'll show you what's been marked previously as State's Exhibit No. 2, and ask you if you can identify this, please [handing to witness].

WITNESS: Yes, this is the form that I read to Ray Dansby that morning. It's noted here at the top 9:00 a.m., at the bottom 9:14 a.m. which would have been the time that I read directly to him from the form and that he signed it.

COUNSEL FOR STATE: Okay. And then at some point did he also decline to talk?

WITNESS: Yes, at 9: ...

COUNSEL FOR DEFENDANT: Objection.

WITNESS: . . . 21 a.m.

COUNSEL FOR DEFENDANT: Objection.

THE COURT: What's your objection?

MS. THORNTON: May we approach?

Dansby cites the United States Supreme Court decision in *Griffin* v. *California*, 380 U.S. 609 (1965), in support of his position that Lieutenant Hill's testimony contained an improper reference to his right to remain silent under the Fifth Amendment; however, *Griffin* prohibits comment on a defendant's failure to testify at trial, and is thus of no consequence here. As the State correctly asserts in its brief, Dansby mischaracterizes the elicited testimony of Lieutenant Hill as being a comment on the invocation of Dansby's *Miranda* rights. *See Doyle* v. *U.S.*, 426 U.S. 610 (1976); *Greer* v. *Miller*, 483 U.S. 756 (1987); *Tarkington* v. *State*, 313 Ark. 399, 855 S.W.2d 306 (1993). To the contrary, Lieutenant Hill's testimony demonstrated that Dansby waived his right to remain silent and gave a statement to police officers, and according to the earlier testimony of Officer Mike Stegall elicited during cross-examination, when Lieutenant Hill attempted to record Dansby's statement, Dansby stated that he wanted a lawyer present and that he did not want to talk. In short, the testimony elicited from Lieutenant Hill was not a comment on Dansby's right to remain silent; rather, it merely explained to the jury why there was not a taped statement. Under the circumstances here, we find no error.

## VIII. *Previous felony as aggravating circumstance*

For his next assignment of error, Dansby argues that the court erred in admitting, during the penalty phase, a sworn state-

ment of the victim, Brenda Dansby, recorded at his revocation hearing eight years prior to her murder. In this statement, it was her testimony that in October of 1985, Ray forced his way into her house by prying a door open with a pocketknife. She further testified that when she asked him to leave, he stated that he would not unless she went to bed with him, which she did, and that soon afterwards she reported the incident to police.

Dansby argues that Ms. Dansby's testimony should not have been allowed during the sentencing phase of his trial because it was previously admitted at a revocation proceeding which requires a lesser degree of proof than is required to sustain a criminal conviction. We have stated that the same degree of proof is not required to sustain a finding that an aggravating or mitigating circumstance exists, as would be required to sustain a conviction if the circumstance was a separate crime. *Clines v. State*, 280 Ark. 77, 656 S.W.2d 684 *cert. denied*, 465 U.S. 1051 (1984). If there is evidence of an aggravating or mitigating circumstance, however slight, it is sufficient to submit that issue to the jury. *Id.*

The statute in question is codified at Ark. Code Ann. § 5-4-604(3) (1987), which permits the State to prove, as an aggravating circumstance, that the defendant has previously *committed* a violent felony. In this instance, we have held that this provision applies to crimes not connected in time and place to the killing for which the defendant has just been convicted. *See Hill* v. *State*, 289 Ark. 387, 713 S.W.2d 233 (1986), *cert. denied*, 479 U.S. 1101 (1987). Arkansas Rule of Evidence 804(b)(1) provides the following hearsay exception:

> Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

At the revocation hearing, Brenda's testimony was given under oath, and not only was Ray represented by counsel and thus had the opportunity to cross-examine her testimony, Brenda was in fact cross-examined. Looking at Ms. Dansby's recorded testimony, there was some evidence that Dansby had previously com-

mitted a felony involving violence to her, and under these circumstances, the trial court did not abuse its discretion in allowing the transcript of her testimony to be admitted during the penalty phase.

## IX. AMCI Form 2

Dansby argues that the court erred in denying his request to submit his version of Form Two of the Arkansas Model Jury Instructions: Criminal (2d ed.) on mitigating circumstances, which added sixteen possible mitigating factors. Since the jury recommended the penalty of death by lethal injection on each charge, we consider it appropriate to give a full recital of both Dansby's proffered instruction on mitigating circumstances, and Form Two of the AMCI which was utilized by the trial court in its instruction to the jury. Dansby's offered form reads as follows:

A. ( ) We unanimously find that the following mitigating circumstances probably existed at the time of the murder:

(Check applicable circumstances and specify any additional ones.)

1. ( ) Ray Dansby turned himself in to the police and did not try to hide from or flee from police.

2. ( ) Ray Dansby cooperated with the police by giving a statement and telling them what had happened.

3. ( ) Ray Dansby had a good work history at El Dorado Paper Bag.

4. ( ) Ray Dansby has a lot of family support.

5. ( ) Ray Dansby was well liked and respected in his community.

6. ( ) Outside of his relationship with Brenda Dansby, Ray Dansby has had no involvement with the law.

7. ( ) Outside of problems in his relationship with Brenda Dansby, Ray Dansby has been law abiding.

8. ( ) Ray Dansby has always been a quiet person and has kept to himself.

9. ( ) Ray Dansby has demonstrated his ability to adjust and contribute while incarcerated.

10. ( ) While the relationship between Ray and Brenda Dansby was tumultuous, Ray Dansby was not the only person responsible.

11. ( ) Ray and Brenda's relationship could be characterized as on again/off again.

12. ( ) Ray Dansby loved Brenda Dansby.

13. ( ) Although the homicide was not justified, the evidence indicates that the homicidal act occurred during an argument or fight.

14. ( ) From the evidence, it is clear that the victims in this case had loaded weapons.

15. ( ) From the evidence, it is clear that the victims intended to and in fact, did use their weapons.

16. ( ) Other: Specify in writing._____

B. ( ) One or more members of the jury believed that the following mitigating circumstances probably existed, but the jury did not unanimously agree.

[repeat same sixteen factors]

C. ( ) There was evidence of the following mitigating factors, but the jury unanimously agreed that they did not exist at the time of the murder.

[repeat same sixteen factors]

D. ( ) There was no other evidence of any mitigating circumstances. (Check if applicable.)

██ ██ The standard version of Form 2 submitted to the jury reads as follows:

A. ( ) We unanimously find that the following mitigating circumstances probably existed at the time of the murder:

( ) The capital murder of Brenda Dansby was committed while Ray Dansby was under extreme mental or emotional disturbance.

( ) The capital murder of Brenda Dansby was committed while Ray Dansby was acting under unusual pressures or influences or under the domination of another person.

( ) The capital murder of Brenda Dansby was committed while the capacity of Ray Dansby to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect, intoxication, or drug abuse.

( ) The youth of Ray Dansby at the time of the commission of the capital murder of Brenda Dansby.

( ) The capital murder of Brenda Dansby was committed by another person and Ray Dansby was an accomplice and his participation relatively minor.

( ) Ray Dansby has no significant history of prior criminal activity.

( ) Other specify in writing: _____

---

B. ( ) One or more of the members of the jury believed that the following mitigating circumstances probably existed, but the jury did not unanimously agree:

[repeat same factors]

C. ( ) There was evidence of the following mitigating factors, but the jury unanimously agreed that they did not exist at the time of the murder:

[repeat same factors]

D. ( ) There was no evidence of any mitigating circumstance.

Relying on our decision in *Sheridan* v. *State, supra*, the trial judge offered the following explanation:

If you find unanimously that one or more aggravating circumstances exist, you should then complete Form 2, which

deals with mitigating circumstances. However, you are not limited to this list. You may, in your discretion, find other mitigating circumstances.

This explanation is verbatim that which was offered in *Sheridan* v. *State, supra,* to which we responded as follows:

> In support of his argument, Sheridan cites *Penry* v. *Lynaugh*, 492 U.S. 302 (1989). In *Penry*, the United States Supreme Court found that a criminal defendant's Eighth Amendment prohibition upon the infliction of cruel and unusual punishment is violated when he is sentenced to death and no instructions were given informing the jury that it could consider and give effect to mitigating evidence of the defendant's mental retardation and former abuse received. The United States Supreme Court has held that it is a mandatory safeguard of the Eighth Amendment for the sentencing body to be allowed to consider any mitigating factor that is relevant to the particular offender's case. *California* v. *Brown*, 479 U.S. 538 (1987); *Roberts* v. *Louisiana*, 431 U.S. 633 (1977); *Gregg* v. *Georgia*, 428 U.S. 153 (1976). The defense must be allowed during the sentencing phase to introduce any relevant mitigating evidence the defense proffers concerning the character or history of the offender or the circumstances of the offense. *California* v. *Brown*, supra. Not only must relevant mitigating evidence be admitted, it must actually be considered, which in appropriate cases means specifically instructing the jury to do so. *Penry* v. *Lynaugh, supra; Eddings* v. *Oklahoma*, 455 U.S. 104 (1982). In other words, any death sentence that results from a deliberate exclusion of any relevant mitigating evidence is presumptively invalid. *Hitchcock* v. *Dugger*, 481 U.S. 393 (1987).
>
> Applying these U.S. Supreme Court rules to the instant case, it is clear to us that the jury was not limited to the mitigating factors listed on Form 2 but was invited by the judge to consider any others they saw fit and to write them in the blank spaces provided in each category. Therefore, the submission of Form 2 to the jury instead of the form proffered by Sheridan did not act as an impermissible exclusion of relevant mitigating factors. The court specifically

told the jurors that the mitigating factors listed were not the sole ones to be considered and that they could consider other factors.

*Sheridan* v. *State, supra*, at 37-8, 779.

### X. Number of aggravating circumstances required

██ For his final point of error, Dansby asserts that Arkansas's statutes, particularly Ark. Code Ann. § 5-4-603 (Repl. 1993), require that more than one aggravating circumstance be present for a jury to impose the death penalty. We rejected this argument in *Hayes* v. *State*, 280 Ark. 509, 509-H, 660 S.W.2d 648 (1983). In *Hayes*, this court referred to Ark. Stat. Ann. § 1-201 (Repl. 1977), which is codified in Ark. Code Ann. § 1-2-203(b)(1987), and provides as follows:

> Whenever, in any statute, words importing the plural number are used in describing or referring to any matter, parties, or persons, any single matter, party, or person shall be deemed to be included, although distributive words may not be used.

In referring to this statute, we said in *Hayes* that the only requirement is that the jury unanimously find at least one of the aggravating circumstances to exist before it can impose the death penalty. *Hayes* v. *State, supra.*

It is significant to note that, with respect to each charge, the jury found three aggravating circumstances in this case: (1) that Dansby previously committed another felony an element of which was the use or threat of violence to another person or creating substantial risk of death or serious physical injury to another person; (2) that in the commission of the capital murder, Dansby knowingly created a great risk of death to a person other than the victim; and (3) that the capital murder was committed in an especially cruel or depraved manner. In short, we find no merit to Dansby's argument on this point.

### XI. Proportionality review of death cases

██ We have recently undertaken a proportionality review of capital cases involving the death penalty. *See Sheridan* v. *State, supra.* Particularly, we have recently "agree[d] that the killing of more than one person 'automatically' convert[s] [the case]

into a death case." *Cox* v. *State*, 313 Ark. 184, 853 S.W.2d 266 (1993). In *Cox*, we reasoned that this automatic death qualification is "because appellant committed the capital offenses under a circumstance that the legislature had enumerated as an aggravating factor." *Id.* The jury found Dansby guilty of the murders of Brenda Dansby and Ronnie Kimble, and as such, its consideration of the death penalty was not error.

We find no prejudicial errors warranting reversal and accordingly, affirm the decision of the trial court.

ROAF, J., not participating.